United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK TICER,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GREGORY YOUNG, et al.,<br><br>　　　　Defendants. | Case No. 16-cv-02198-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 11 |

　　　　Plaintiff Mark Ticer brings this suit against Defendants Gregory Young and the Board of Trustees of the California State University ("CSU"), alleging violations of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973, as well as intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. (Compl., Dkt. No. 1.) Pending before the Court is Defendant CSU's motion to dismiss Plaintiff's complaint. (Def's. Mot., Dkt. No. 11.) Upon consideration of the moving and responding papers, as well as the arguments presented at the August 18, 2016 motion hearing, and for the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Defendant CSU's motion to dismiss.

## I.　BACKGROUND

### A.　Factual background

　　　　In 2000, Plaintiff was accepted as a student in San Jose State University's ("SJSU") Biomedical, Chemical, and Materials Engineering ("BCME") Department. (Compl. ¶ 7.) Plaintiff suffers from chronic schizophrenia, which results in a fear of people that can cause him serious emotional problems. (Compl. ¶¶ 8, 9.) Plaintiff registered with the SJSU Disability Resource Center ("DRC") in March 2001. (Compl. ¶ 8.) The DRC determined that Plaintiff was eligible to

participate in the Chemical Engineering Program as a disabled student, and that Plaintiff was eligible for extended time on exams as an accommodation. (*Id.*) The DRC also issued Plaintiff a DRC identification card. (*Id.*)

Plaintiff alleges that he experiences medication problems and other disability-related issues that can lead to delays with his homework assignments. (Compl. ¶ 9.) While he was usually able to complete the assignment by the due date, he occasionally had difficulty delivering them on time due to his fear of people. (*Id.*) Almost every professor accepted Plaintiff's homework assignments after Plaintiff showed them his DRC card and explained the delay. (*Id.*) However, in Fall 2003, Plaintiff took ChE190 with Professor Gregory Young, who was the BCME Department Associate Chair (and later the full Department Chair) and Plaintiff's academic advisor. (Compl. ¶¶ 12, 13.) Professor Young required that homework assignments be submitted during the first five minutes of class. (Compl. ¶ 13.) When Plaintiff met with Professor Young to explain that his homework was late due to his disability, Professor Young still refused to accept the assignment. (*Id.*) Later that semester, Plaintiff proposed e-mail delivery of his homework several times, but Professor Young would become angry and "scold[] Plaintiff while complaining about the inconvenience that the email solution would cause him." (Compl. ¶ 14.) Professor Young's syllabus stated that an exam could be excused if he was presented with a written request. (Compl. ¶ 15.) Plaintiff provided a written request, explaining that he had a fear of people that caused emotional difficulties on the day of the exam. (*Id.*) Professor Young became angry and said he did not have time to constantly allow Plaintiff to make up his exams, said Plaintiff could not pass the class with these problems, and told Plaintiff that he should change his major. (*Id.*)

On December 16, 2003, Plaintiff met with the BCME Department Chair, Dr. Allen, to ask if she would support an incomplete ("I") grade in Professor Young's class, which would extend the time for Plaintiff to complete the class. (Compl. ¶ 16.) Plaintiff explained his disability, but Dr. Allen allegedly responded by telling Plaintiff that the engineering program would be too difficult for Plaintiff with these problems, and suggesting he change his major. (*Id.*) That day, Dr. Allen sent Plaintiff a letter stating that his work in Professor Young's class did not warrant an incomplete grade, but an unauthorized withdrawal ("U"). (Compl. ¶ 17, Exh. H.) She identified four classes

2

that Plaintiff had outstanding "I" or "W" grades in, and suggested that Plaintiff seek assistance from the DRC's academic advisor and the SJCSU Counseling Center. (*Id.*) She did not advise Plaintiff to seek counseling within the BCME Engineering Department, which Plaintiff contends is evidence that she was pressuring him to seek a new major. (Compl. ¶ 17.) Plaintiff later completed the four classes he had outstanding "I" or "W" grades in, receiving grades of A, B, B, and A-. (Compl., Exh. Q.)

Because Professor Young was the only professor who taught ChE190, Plaintiff re-enrolled in Professor Young's class in Fall 2004. (Compl. ¶ 21.) When Plaintiff asked Professor Young to accept his homework late, Professor Young became angry and refused. (*Id.*) Professor Young also refused to accept the homework by e-mail, and told Plaintiff that he could not work as an engineer if he could not turn his homework in on time. (*Id.*) Plaintiff became frightened by this conduct. Because he believed he could not ask Dr. Allen for help without her pressuring him into picking a new major or dismissing him from the program, he withdrew from the ChE190 class. (*Id.*)

In 2006, Professor Young told Plaintiff that his previously completed engineering classes were going to expire and that he would need to retake the classes. (Compl. ¶ 22.) Professor Young also told Plaintiff that he would not be able to graduate and that it would be a waste of both Plaintiff's and Professor Young's time to continue his engineering studies. (*Id.*) Plaintiff learned in 2015 that he could have asked for an alternative to retaking the classes, but Professor Young did not offer him any alternatives. (Compl. ¶ 23.) Professor Young again pressured Plaintiff into changing his major. (Compl. ¶ 22.) Plaintiff refused, and repeated his expiring classes. (*Id.*)

Plaintiff again registered for Professor Young's ChE190 class in Fall 2006. (Compl. ¶ 24.) Professor Young refused to accept Plaintiff's late homework assignments and did not allow Plaintiff to make up exams, preventing Plaintiff from passing the class. (*Id.*) Plaintiff contends that when he did deliver his homework assignments in time, he received high scores. (*Id.*, Exh. I.)

In January 2007, Professor Young and Dr. Allen were in a BCME faculty meeting to discuss Plaintiff's grade point average dropping below 2.0 in the Junior Core Chemical Engineering Classes. (Compl. ¶ 25, Exh. J.) The drop was due to Plaintiff receiving a D in

3

Professor Young's ChE190 class. Despite this, the faculty advised Plaintiff to enroll in ChE160A, a higher-level course that was only taught by Professor Young. (Compl. ¶¶ 25, 26.)

Plaintiff enrolled in Professor Young's ChE160A class in Spring 2007. (Compl. ¶ 27.) Plaintiff contends that enrolling in the class caused him fear, anxiety, and apprehension, as he worried that Professor Young would prevent him from passing the class which in turn could disqualify him from the program. (*Id.*) During the semester, Plaintiff had a medication problem that prevented him from delivering a homework assignment in time. (Compl. ¶ 28.) When he asked Professor Young to accept the late homework, Professor Young got angry, denied the request, and told Plaintiff that he would fail the class if he had another late assignment. (*Id.*) Professor Young also told Plaintiff he would have to repeat the ChE190 class if he did not change his major. (*Id.*) Plaintiff dropped out of the class. (*Id.*)

Plaintiff re-enrolled in Professor Young's ChE190 class in Fall 2007, per Professor Young's requirement. (Compl. ¶ 30.) Professor Young again refused to allow Plaintiff to turn in his homework late. Professor Young later told Plaintiff that he had to complete the ChE190 class because he would not sign a class withdrawal request. Plaintiff became frightened and stopped attending the class. (*Id.*)

From 2008 to 2009, Professor Young left SJSU on sabbatical. Plaintiff was able to complete additional courses during his sabbatical. (Compl. ¶ 31.) When Professor Young returned, Plaintiff re-enrolled in Professor Young's ChE190 class in Fall 2009. (Compl. ¶ 32.) Plaintiff stopped attending due to emotional problems caused by the presence of Professor Young, and took a break from the semester. (*Id.*) In Spring 2010, Plaintiff took two courses that he had completed at community college but that Professor Young told him to repeat. (Compl. ¶ 33.) However, due to "his years of negative experience" with Professor Young, his disability worsened and he was unable to complete the classes. (*Id.*) Plaintiff did not return to SJSU in Fall 2010, and was authorized a medical leave of absence in January 2011 by Dr. Gleixner, the Associate Chair of the BCME Department. (Compl. ¶¶ 34, 35.)

In September 2011, Plaintiff tried to extend his medical leave, which required Professor Young's signature. (Compl. ¶ 36.) Professor Young refused to sign "because he was not a

4

psychiatrist," told Plaintiff that he should have been dismissed from SJSU long ago, and that Plaintiff had been wasting everyone's time. (*Id.*) Professor Young also criticized Dr. Gleixner for approving the first medical leave of absence. (*Id.*) Plaintiff became frightened and reported Professor Young's behavior to Dr. Allen. (Compl. ¶ 37.) Dr. Allen expressed no concerns about Professor Young's behavior, but approved the medical leave extension. (*Id.*)

Plaintiff did not return to SJSU after the medical leave expired, due to his prior encounter with Professor Young. (Compl. ¶ 38.) When Plaintiff attempted to get a medical leave extension during the Spring 2013 semester, the SJSU Office of the Registrar denied the request. (*Id.*)

During the medical leaves, Plaintiff became concerned that he would lose his tuition payments from the Department of Rehabilitation ("DOR"). (Compl. ¶ 39.) To explain his problem with Professor Young, Plaintiff wanted to chart his homework scores and present his findings to the DOR. (*Id.*) To show the scores were authentic, Plaintiff met with Professor Young in December 2013, requesting official copies of his homework records. (Compl. ¶¶ 39, 40.) Professor Young said he would contact Plaintiff if he found the records. (Compl. ¶ 40.) However, when Plaintiff contacted DOR to schedule an appointment, he learned that DOR had closed his file in December 2011. (Compl. ¶ 41.) He contacted Professor Young to let him know the information was no longer needed, but Professor Young e-mailed him the homework data from Fall 2006 regardless. (*Id.*)

In 2014, Plaintiff decided he wanted to return to SJSU, which would require reopening his file with DOR. (Compl. ¶ 42.) He again wanted to chart his homework scores, as he was concerned that DOR would deny him financial support due to his difficulty passing Professor Young's classes. (*Id.*) On April 21, 2014, Plaintiff met with Professor Young to ask for the homework records. (Compl. ¶ 43.) Upon seeing Plaintiff, Professor Young became angry. (*Id.*) When Plaintiff explained he wanted his remaining homework records for his DOR reinstatement, Professor Young gave him his homework record from the ChE160A class. (Compl. ¶¶ 43, 44.) The record also included Plaintiff's record in his exams and lab work, even though Plaintiff had not requested this information. (Compl. ¶ 44, Exh. N.)

On April 23, 2014, Plaintiff returned to Professor Young's office. (Compl. ¶ 45.)

5

1  Professor Young was angry to see him. (*Id.*) Plaintiff again asked for the homework records,
2  requesting that they be presented in the same format as the record sent by Professor Young in
3  December 2013. (*Id.*) Professor Young agreed, but told Plaintiff the records would not help his
4  reinstatement with DOR. (*Id.*) Plaintiff also explained he would need academic counseling to
5  return to the Chemical Engineering Program, and Professor Young replied that he was not eligible
6  to return. (Compl. ¶ 46.) Plaintiff asked Professor Young to authenticate the December 2013
7  record, but Professor Young refused. (*Id.*) As Professor Young was preparing the new records,
8  Plaintiff explained that only homework data was needed. Professor Young replied that he was
9  preparing what the DOR needed to see, and began scolding Plaintiff, telling Plaintiff that this was
10 a waste of his and the DOR's time. (*Id.*) Professor Young told Plaintiff not to return to his office,
11 then ordered Plaintiff to follow him outside of his office and into an area where there were other
12 students and staff members. Professor Young continued to insult and accuse Plaintiff in front of
13 others, telling him that he did not know what he was doing, that he was causing trouble, and that
14 he was wasting Professor Young's time. (*Id.*) Professor Young handed him the homework record
15 (which again contained information about the incomplete exams and labs) and continued to scold
16 him as Plaintiff left. (*Id.*, Exh. O.) During this incident, Plaintiff's distress was so severe that he
17 could not breathe. (Compl. ¶ 47.) He has been suffering from severe Post-Traumatic Stress
18 Disorder since. (Compl. ¶ 48.) Plaintiff also believes that by providing him with a homework
19 record with information about the incomplete exams and labs, Professor Young was trying to
20 "encourage a negative response by the DOR to Plaintiff's reinstatement efforts." (Compl. ¶ 49.)
21    In August 2014, Plaintiff reported the April 23, 2014 incident to SJSU's Ombudsperson
22 Office. (Compl. ¶ 50.) Plaintiff spoke to the Human Resources Department, but no one ever
23 contacted him to investigate or report any action taken. (*Id.*) On October 23, 2014, Plaintiff filed
24 a claim with CSU's Office of the Chancellor, Risk Management and Public Safety Department.
25 (Compl. ¶ 51.) CSU stated it would investigate the April 23, 2014 incident, but that the other
26 events were untimely. (Request for Judicial Notice ("RJN"), Exh. 2 (Dkt. No. 11).)
27    **B.    Procedural background**
28    Plaintiff filed this action on April 22, 2016. On May 16, 2016, the summons as to

Defendant Young were returned unexecuted, and Defendant Young has not been served or appeared in this case. (Dkt. No. 10.) On June 3, 2016, CSU filed the instant motion to dismiss, along with a Request for Judicial Notice. (Def.'s Mot., Dkt. No. 11.) On June 30, 2016, Plaintiff filed a "Motion to Dismiss All State Claims Pursuant to Federal Rules of Civil Procedure 41(a)," requesting that the Court dismiss all of the state claims. (Dkt. No. 19.) On July 6, 2016, the Court issued an order construing Plaintiff's filing as a voluntary dismissal of the state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence, and dismissed the state claims. (Dkt. No. 20.) On August 9, 2016, Plaintiff filed his opposition to CSU's motion to dismiss. (Pl.'s Opp'n, Dkt. No. 26.) Plaintiff did not file an opposition to the Request for Judicial Notice. On August 23, 2016, CSU filed its reply. (Def.'s Reply, Dkt. No. 27.)

## II.  LEGAL STANDARD

### A.  Request for judicial notice

A district court may take judicial notice of facts not subject to reasonable dispute that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). A court may, therefore, take judicial notice of matters of public record. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

### B.  Motion to dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

## III.   DISCUSSION

### A.   Request for judicial notice

Defendants ask that this Court take judicial notice of: (1) the "CSU Claim Form" submitted by Plaintiff on October 23, 2014, and (2) CSU's November 14, 2014 response, stating that CSU would investigate the April 23, 2014 event. Plaintiff did not file an opposition to Defendants' request for judicial notice, and so Plaintiff is not deemed to dispute the authenticity of any of the exhibits. The Court may take judicial notice of the filing date and content of the CSU Claim Form, and of the filing date and content of CSU's response as these documents are a matter of public record which set forth facts "capable of accurate and ready determination by resort to

sources whose accuracy cannot be reasonably questioned." *Clarke v. Upton*, 703 F. Supp. 2d 1037, 1042 (E.D. Cal. 2010) (taking judicial notice of tort claims and their rejection by the county).

### B.     Statute of limitations

CSU argues that Plaintiffs' claims concerning events other than the April 23, 2014 interaction between Plaintiff and Professor Young are time-barred.[1]

Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Because "Title II does not contain an express statute of limitations," the Court "borrow[s] the statute of limitations applicable to the most analogous state-law claim, so long as it is not inconsistent with federal law or policy to do so."  *Sharkey v. O'Neal*, 778 F.3d 767, 770 (9th Cir. 2015) (internal quotation omitted).  The Ninth Circuit has held that "California Government Code § 11135 provides the most analogous state-law claim to a Title II claim" as § 11135 "provides an almost identical state-law counterpart to Title II," and that a three-year statute of limitation applies.  *Id.* at 771, 773.

Section 504 of the Rehabilitation Act provides: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794.  Like Title II, the Rehabilitation Act does not contain its own statute of limitations, so the Court must look at the most analogous state-law claim.  *Kramer v. Regents of Univ. of Cal.*, 81 F. Supp. 2d 972, 973 (N.D. Cal. 1999).  Post-*Sharkey*, the district court in *Hartline v. National University* held that a claim under Section 504 of the Rehabilitation Act "is most closely analogous to a personal injury claim or to an Unruh Act claim," and thus applied a two-year statute of limitations.  No. 2:14-cv-635 KJM AC (PS), 2015 WL 4716491, at *5 (E.D. Cal. Aug. 6, 2015).  The Ninth Circuit,

---

[1] At the hearing, CSU clarified that it was not arguing that the California Torts Claim Act applied to the federal claims.

however, has explained that "Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act," and that the same analysis applies to both. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Given that Title II and § 504 create the same rights and obligations, *see Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1055 n.1 (9th Cir. 2004), it would seem that § 11135 would also provide the most analogous state-law claim to a § 504 claim, thus creating a three-year statute of limitations. *See Sharkey*, 778 F.3d at 771.

Even assuming a three-year statute of limitations for both the Title II and § 504 claims, the vast majority of Plaintiff's allegations take place more than three years prior to the filing of his complaint on April 22, 2016. The only wrongful event that occurred after April 22, 2013 is Plaintiff's April 23, 2014 meeting with Professor Young.[2] Otherwise, the last interaction Plaintiff had with Professor Young was in September 2011, when Professor Young denied a medical leave extension that was then approved by Dr. Allen. (Compl. ¶¶ 36, 37.) SJSU's Office of the Registrar denied another medical leave extension during the Spring 2013 semester, but Plaintiff does not specify an exact date for this denial nor does he appear to base his Title II or Rehabilitation Act claims on this denial. (Compl. ¶¶ 38, 63, 75.) Thus, the majority of Plaintiff's allegations are time-barred.

In his opposition, Plaintiff argues that allegations that fall outside the statutory period are not time-barred because: (1) the continuing violations doctrine applies, and (2) Plaintiff is bringing a "hostile learning environment" claim. (Pl's. Opp'n at 5.)

### 1. Continuing violations doctrine

"The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's rights up to a point in time that falls within the applicable limitations period." *Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 822 (9th Cir. 2001). The Ninth Circuit originally recognized two methods to establish a continuing violation. "First, the plaintiff may show a serial violation by pointing to a series of related acts against one individual,

---

[2] Plaintiff also met with Professor Young on December 2, 2013, but states that Professor Young was "approachable" on that day and does not allege any wrongful action during that meeting. (Compl. ¶ 40.)

of which at least one falls within the relevant period of limitations." *Id.* "Second, a plaintiff may show a systematic policy or practice of discrimination that operated, in part, within the limitations period-a systemic violation." *Id.* (internal quotation omitted). The Supreme Court subsequently rejected the "serial violation" method, explaining that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Thus, to succeed on a continuing violations theory, Plaintiff must challenge a "systematic policy or practice of discrimination."

Plaintiff does not allege a systemic policy or practice. The Ninth Circuit has explained that a pattern-or-practice claim "cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace." *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (2003). In *Cherosky*, the four plaintiffs requested permission to use a respirator at work, which the employer denied pursuant to its policy of prohibiting respirators except where air contaminants exceeded regulatory limits. *Id.* at 1245. The Ninth Circuit found that this did not constitute a pattern or practice because the plaintiffs did not attempt to show that the employer "widely discriminates against employees with disabilities or that it even routinely discriminates with respect to respirator requests." *Id.* at 1247. Moreover, the plaintiffs did not assert that the general rule prohibiting respirators was discriminatory. Instead, the plaintiffs were challenging the "individualized decision" to deny the accommodation request, and "[t]hese individualized decisions are best characterized as discrete acts, rather than as a pattern or practice of discrimination." *Id.*; *contrast with Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, Case No. C06-5125 SBA, 2009 WL 2982840, at *2 (N.D. Cal. Sept. 14, 2009) (applying continuing violations doctrine where the plaintiffs expressly challenged the defendants' reliance on inadequate guidelines and procedures that failed to ensure necessary access).

Here, although Plaintiff alleges that Professor Young "engaged Plaintiff with a pattern of discrimination involving deliberate indifference," Plaintiff is not challenging a systemic policy or widespread practice of discrimination that is a regular part of the school environment. Instead,

Plaintiff is ultimately challenging Professor Young's individual decision not to accept late homework. As to the other allegations that Professor Young required Plaintiff to retake certain courses or that BCME advised Plaintiff to take a class that they did not expect him to pass, there is no allegation that these decisions were made according to system-wide policy or practice. In fact, with respect to SJSU itself, Plaintiff alleges that "virtually all SJSU professors" accepted his late homework assignments or allowed Plaintiff to make up his exams, further emphasizing that Professor Young's refusal to accept late homework from Plaintiff was not according to any systemic policy or practice by SJSU. (*See* Compl. ¶ 10.) The Court finds that Plaintiff has not adequately alleged a continuing violation against the university.

### 2. Hostile learning environment

In the alternative, Plaintiff argues that there was a "hostile learning environment." (Pl's. Opp'n at 5-6.) In *Morgan*, the Supreme Court explained that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" 536 U.S. at 117. If an act contributing to the hostile work environment claim falls within the statutory period, the entire duration of the hostile environment claim can be considered because all of the acts are part of the single claim. *Id.* at 117-18.

As an initial matter, the parties dispute whether the Ninth Circuit recognizes a hostile learning environment claim under the ADA or Rehabilitation Act. In *Garedakis v. Brentwood Union School District*, the district court declined to recognize a hostile learning environment claim, noting that "this court was unable to locate any decision by the Ninth Circuit or by any district court within the Ninth Circuit recognizing a claim of hostile educational environment under the ADA or § 504, against a school board." -- F. Supp. 3d --, Case No. 14-cv-4799-PJH, 2016 WL 1718270, at *10 (N.D. Cal. Apr. 29, 2016). Outside of this circuit, the district court in *Guckenberger v. Boston University* found that a hostile learning environment claim did exist under the ADA and Rehabilitation Act. 957 F. Supp. 306, 313 (D. Mass. 1997). Based on the statutory language, it explained that "[b]oth statutes apply to discrimination by educational facilities in receipt of federal funds, and neither limits its prohibitions to discrimination in the employment context." *Id.* Further, the statutory language "is substantially similar to Title IX of the Education

1   Amendments of 1972, which courts have held is the statutory basis for hostile learning
2   environment claims based on sexual harassment." *Id.* The district court thus concluded that "there
3   is a cause of action under the ADA and the Rehabilitation Act for a hostile learning environment
4   when harassment based on a student's disability has the purpose of unreasonably interfering with
5   the individual's performance or of creating an intimidating , hostile, or offensive environment."
6   *Id.* at 314 (internal quotation and modifications omitted). This conclusion was "consistent with
7   the express congressional purpose in enacting the ADA to 'address the major areas of
8   discrimination faced day-to-day by people with disabilities.'" *Id.* (quoting 42 U.S.C. § 12101(b)).
9       Although the Court finds the *Guckenberger* court's holding persuasive, it is not clear
10  Plaintiff's hostile learning environment claim would be timely based on the April 23, 2014
11  meeting between Plaintiff and Professor Young. As CSU pointed out at the hearing, Plaintiff was
12  no longer a student, but was seeking to return to the program. Because Plaintiff was no longer a
13  student, the April 23, 2014 meeting was not a part of the hostile learning environment that
14  Plaintiff alleges took place when he was still a student. At best, it provides additional evidence of
15  Professor Young's hostility towards him, but the single incident itself is not sufficient to establish
16  a hostile learning environment claim. Plaintiff does not allege that an incident within the statute of
17  limitations occurred while he was still enrolled.

18      **3. Tolling**

19      The Court concludes, however, that Plaintiff may be able to allege facts to support a tolling
20  argument. At the hearing, Plaintiff indicated that the reason he did not bring his claims sooner
21  was because he was not aware that he had a claim, as he believed that his problems were due to his
22  disability or medication. "Equitable tolling applies when the plaintiff is prevented from asserting a
23  claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances
24  beyond the plaintiff's control made it impossible to file a claim on time." *Stoll v. Runyon*, 165
25  F.3d 1238, 1242 (9th Cir. 1999). The Ninth Circuit has held that "mental incompetence
26  constitutes a ground for equitable tolling . . . when mental incompetence precludes a person from
27  asserting his rights during the proper time period . . . ." *Brockamp v. United States*, 67 F.3d 260,
28  263 (9th Cir. 1995), *rev'd on other grounds by United States v. Brockamp*, 519 U.S. 347 (1996);

United States District Court
Northern District of California

*see also Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008) (citing *Brockamp* for the proposition that equitable tolling may be appropriate "if a medical condition prevented a plaintiff from filing suit").  Here, Plaintiff explained that it was not until he was diagnosed with Post-Traumatic Stress Disorder resulting from his interactions with Professor Young that he realized he had a claim; in short, Plaintiff was impaired and could not recognize his claims.  Moreover, Plaintiff explained that Defendants created an "illusion" that everything was proceeding properly and that no accommodations were available to him.  For example, Professor Young and Dr. Allen both refused to give him accommodations, instead telling him to change his major, and the faculty told him to take Professor Young's class without affording him any accommodations despite knowing of his prior problems passing Professor Young's class without accommodations.  Plaintiff further stated during the hearing that it was not until 2014 that he understood that the lack of accommodations was a problem that supported a claim.

The Court will therefore dismiss Plaintiff's claims based on events outside the statutory period with leave to amend, so that Plaintiff can plead additional facts to support an equitable tolling argument.  In addition to the facts stated during the hearing, Plaintiff should explain when he was incapacitated and for what period, as well as when and why he realized he had a claim.  Plaintiff should also provide additional facts as to what accommodations he was entitled to, including what, if any, accommodations the DRC and SJSU were to provide him.[3]

### C.    Disability discrimination claim

CSU next argues that Plaintiff cannot establish his Title II or Rehabilitation Act claim. (Def.'s Mot. at 7.)  To make a prima facie case under the ADA or Rehabilitation Act, Plaintiff must allege: (1) that he is disabled under the Act; (2) he is "otherwise qualified" to participate in or receive the benefit of the public entity's services, programs, or activities; (3) he was either

---

[3] Under the relevant statutes, an individual is not entitled to any accommodation that he requests. Rather, "an educational institution is not required to make fundamental or substantial modifications to its programs or standards; it need only make reasonable ones." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1046 (9th Cir. 1999).  "[T]he issue of reasonableness depends on individual circumstances of each case," including a showing that the institution satisfied its "duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are *necessary* to enable the individual to meet the standards in question." *Wong*, 192 F.3d at 818 (internal quotations and modifications omitted).

14

excluded from participating in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) the exclusion, denial of benefits, or discrimination was because of his disability. *E.R.K. ex rel. R.K. v. Haw. Dep't of Educ.*, 728 F.3d 982, 992 (9th Cir. 2013) (internal quotation omitted); *see also Duvall*, 260 F.3d at 1135. Because the Court has dismissed without prejudice Plaintiff's claims as to events occurring before April 22, 2013 as time-barred, the Court focuses its analysis on the April 23, 2014 meeting between Plaintiff and Professor Young.

### 1. Standing

CSU contends that Plaintiff lacks standing as to the April 23, 2014 event because he was not a student at the time. (Def's. Mot. at 8.) Plaintiff concedes that he was acting more akin to an applicant at this time. (Pl's. Opp'n at 6.) Neither party provides any case law on whether an applicant has standing to invoke the ADA. The Court has not found case law on this issue in this Circuit, although the Ninth Circuit has recognized that a job applicant can bring an ADA claim. *E.g.*, *Cooper v. Neiman Marcus Grp.*, 125 F.3d 786, 790 (9th Cir. 1997) ("Discrimination under the ADA is defined as limiting, segregating, or classifying a job applicant in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such employee") (internal quotation and modification omitted); *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001) ("Under the ADA, the term 'discriminate' is defined as including not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .") (internal quotation omitted). Outside of this Circuit, at least one court has permitted a prospective student to bring an ADA and Rehabilitation Act claim against a school. *E.g.*, *Wolff v. Beauty Basics, Inc.*, 887 F. Supp. 2d 74, 75 (D.D.C. 2012) (denying motion to dismiss ADA and Rehabilitation Act claim of a deaf prospective student where the school would not provide interpreter services for classes).

The Court finds that Plaintiff has standing to bring his claims based on the April 23, 2014 meeting, even if he was not enrolled as a student. Plaintiff was seeking to return to the program, and thus is comparable to a job applicant or a prospective student. To adopt CSU's position that

Plaintiff lacked standing simply because he was not a student would allow a school to discriminate against an applicant solely on the basis of disability without any consequence. This would be contrary to the statutes, which seek to prevent qualified individuals with a disability from being excluded from participation in the activities of a public entity based on their disability alone. Absent any case law in support of CSU's position, the Court declines to limit the ADA's protection to enrolled students only.

### 2. Merits of the disability claim

CSU also argues that Plaintiff does not have a disability as defined by the ADA. An individual is disabled where the individual has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). Congress has since passed the ADA Amendments Acts of 2008, the purpose of which "was to reject that the terms substantially and major in the definition of disability under the ADA need to be interpreted strictly to create a demanding standard for qualifying as disabled . . . ." *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 965 (N.D. Cal. 2013) (internal quotations omitted). "According to the regulations, the term substantially limits 'is not meant to impose a demanding standard' and determining 'whether an impairment "substantially limits" a major life activity should not demand extensive analysis.'" *Id.* (quoting 29 CF.R. § 1630.2(j)(1)(i), (iii)).

The Court wholly rejects CSU's argument that Plaintiff lacks an impairment because "the only activity allegedly limited by plaintiff's disability is that of getting to one class on time." (Def.'s Mot. at 9.) By narrowly focusing on one effect of Plaintiff's disability, CSU completely ignores that Plaintiff has alleged that he suffers from chronic schizophrenia, and that this has resulted in a fear of people that causes serious emotional problems, such as when he is suddenly exposed to the population of students. (Compl. ¶¶ 8, 9.) It was this fear of people that allegedly prevented Plaintiff from getting to class on-time. In short, Plaintiff has alleged that he has problems interacting with other people, which the Ninth Circuit has specifically recognized as a major life activity "because interacting with others is an essential, regular function, like walking and breathing." *McAlindin v. Cty. of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999). The Court finds that Plaintiff has adequately alleged a disability.

16

1   As for CSU's remaining arguments regarding the merits of Plaintiff's claim—whether Plaintiff was excluded from CSU's services, whether Plaintiff was a victim of discrimination, and whether the discrimination was because of Plaintiff's disability—CSU's arguments focus exclusively on Plaintiff's pre-April 23, 2014 allegations, and do not address the April 23, 2014 meeting. (*See* Def.'s Mot. at 9-11.) Because the Court rejects CSU's arguments that Plaintiff lacks standing or a disability, the Court DENIES CSU's motion to dismiss the disability discrimination claims based on the April 23, 2014 meeting and any subsequent events.

### IV.   CONCLUSION

The Court GRANTS CSU's motion to dismiss the ADA and Rehabilitation Act claims based on events prior to April 22, 2013. The dismissal is without prejudice, and Plaintiff has leave to allege facts, if possible, to demonstrate that tolling of the statute of limitations should apply in this case. The Court DENIES CSU's motion to dismiss the ADA and Rehabilitation Act claims based on the April 23, 2014 meeting with Professor Young and subsequent events. Plaintiff has forty-five (45) days from the date of this order to file a First Amended Complaint. Plaintiff is on notice that the First Amended Complaint will supersede the original complaint, such that it will be treated as nonexistent. *See Armstrong v. Davis*, 275 F.3d 849, 878 n.40 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). For this reason, Plaintiff shall properly identify the legal and factual bases for all of his claims, free of any reference to any prior complaint.

IT IS SO ORDERED.

Dated: September 9, 2016

_____
KANDIS A. WESTMORE
United States Magistrate Judge